FILED

2018 MAR -9  PM 2: 56

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

OLIVER DAWOUD, a Florida citizen,

      Plaintiff,

v.

ACRYLIC TANK MANUFACTURING
OF NEVADA, a Nevada corporation,

      Defendant.

_____/

6 :18CV 369-ORL-40-DCI

## **COMPLAINT**

COMES NOW, Plaintiff OLIVER DAWOUD, by and through his undersigned attorney, and sues Defendant ACRYLIC TANK MANUFACTURING OF NEVADA and hereby alleges:

### **The Parties:**

1.    <u>Plaintiff:</u>    OLIVER DAWOUD ("DAWOUD") is a resident and a citizen of Florida and, at all times material hereto, resided at and owned that real property located at 7329 Bella Foresta Place, Sanford, Florida 32771, in Seminole County, Florida ("Dawoud's Residence").

2.    <u>Defendant:</u>    ACRYLIC TANK MANUFACTURING OF NEVADA ("ATM") is a Nevada citizen and corporation with its primary place of business in Las Vegas, Nevada.

3.    ATM also does business as Acrylic Tank Manufacturing, Inc. and Acrylic Tank Manufacturing of Nevada.

4.    ATM lists addresses for each of its officers in Las Vegas, Nevada.

1

5.     ATM's officers direct, control, and coordinate the corporation's activities from Las Vegas.[1]

## Jurisdiction and Venue:

6.     Jurisdiction:     This is an action for breach of contract, unjust enrichment, *quantum meruit* and violation of Florida's Deceptive and Unfair Trade Practice Act, and the amount in controversy exceeds seventy-five thousand dollars ($75,000.00), exclusive of interest, costs, and attorneys' fees.

7.     Pursuant to 28 U.S.C. § 1332(a), this action is within the jurisdiction of this Court due to the complete diversity of the parties.

8.     Venue:     Pursuant to 28 U.S.C. § 1391(b)(2), venue exists in the United States District Court for the Middle District of Florida and, pursuant to Middle District of Florida Local Rule 1.02, is proper in this Court because the facts giving rise to this action occurred in Seminole County, Florida, and the real property underlying this action is located in this Seminole County, Florida, which is within the Orlando Division of the Middle District of Florida.

## General Allegations

9.     ATM designs and constructs custom aquariums and describes itself as the world leader in manufacturing custom aquarium fish tanks.

10.     ATM is featured on Animal Planet television show "Tanked."

---

[1] The Florida Department of State, Division of Corporations, website also identifies an entity named "Acrylic Tank Manufacturing of Nevada Inc.," with a principal place of business in Fort Lauderdale, Florida. However, the Articles of Incorporation for that entity were not filed until September 11, 2015, nearly a year after Dawoud and ATM entered into their agreement for the Aquarium Project (as subsequently described), and that entity was administratively dissolved. *See* **Composite Exhibit "A"** for entity information for ATM and the Florida entity of the same name.

11.     In December 2014, DAWOUD and ATM entered into an agreement to have a sizeable saltwater aquarium built at DAWOUD's Residence (hereinafter, "Aquarium" or "Aquarium Project" or "Project").

12.     DAWOUD intended the Aquarium to serve as the floor beneath the pergola in DAWOUD's backyard. *See* **Exhibit "B."**

13.     On or about December 30, 2014, DAWOUD paid $10,000.00 to ATM as a deposit for the Aquarium Project.

14.     A true and correct photocopy of the deposit invoice and an e-mail confirming receipt of the payment are attached hereto as **Composite Exhibit "C."**

15.     Also on December 30, 2014, ATM contacted Atlas Pools of Central Florida, Inc. ("Atlas Pools"), an apparent subcontractor, and requested "photos, concept design drawing[s], and any additional information that will be useful for us to start putting together Oliver's aquarium." *See* e-mails attached as **Exhibit "D."**

16.     On January 6, 2015, Adam Coyman of Atlas Pools e-mailed 3D photographs to ATM and to DAWOUD. *See* e-mails attached as **Exhibit "D"** and 3D photographs attached hereto as **Exhibit "E."**

17.     On January 7, 2015, the production company for "Tanked" sent DAWOUD a questionnaire regarding his Aquarium Project, and DAWOUD completed and returned the questionnaire. *See* Dawoud's answers to questionnaire (blue font) in **Exhibit "B."**

18.     On January 17, 2015, Frankie DiLuzio ("Frankie") with ATM's Sales and Design team supplemented the questionnaire's answers, confirming the nature and extent

of the Aquarium Project, and wrote in the accompanying e-mails: "I added some information to Oliver's questionnaire that I thought would be good to have for your proposal . . . There were some technical definitions you could use . . . Oliver, I got your back brotha, lol...." *See* e-mails attached as **Exhibit "F"** and **Exhibit "B"** (red font).

19.     On February 12, 2015, Frankie e-mailed Atlas Pools and DAWOUD a sample drawing and an animated video regarding the Project. In his e-mails, Frankie wrote: "[W]e do apologize for these delays, but in order to make this perfect, and that this aquarium is one of kind, it does take a little long[er] than normal, and we apologize that this is holding you up." *See* e-mails attached as **Exhibit "G."**

20.     On February 20, 2015, Frankie e-mailed DAWOUD and Atlas Pools the designs and dimensions for the Aquarium Project. Frankie again noted ATM's sluggish progress on the Aquarium and offered assurances: "Again, our deepest apologies on the delay, but from here on out this will move smoothly for all of us involved." *See* e-mails attached as **Exhibit "H."**

21.     On March 11, 2015, Frankie e-mailed DAWOUD additional renderings of the Aquarium, which ATM still had yet to begin. *See* e-mails at **Exhibit "I."**

22.     Atlas Pools acknowledged receipt of the drawings and responded, in part:

> I am getting desperate to continue the construction . . . . Can you please give me an idea of when the engineer will have the drawings complete. Our reputation as a pool contractor is becoming tarnished because this project is a bloody mess and looks bad in the neighborhood. We are usually 100% complete by this time and it just looks bad. My boss is losing his patience and I am getting pressure.

*See* e-mails at **Exhibit "I."**

23.     Frankie and DAWOUD also spoke on March 11, 2015, regarding the

4

progress of the Project.

24.     That same day, and despite the fact that construction on the Aquarium Project had not yet begun, Frankie informed DAWOUD that ATM required an additional $137,410.00 to continue work on the project:

> [W]e are estimating this project at approximately $368,525.00 . . . . $147,410.00 is 40% of the approximate number and if you take the $10,000.00 you've already given us off that 40%, I would need you to wire us $137,410.00.

*See* e-mails and attachments at **Exhibit "J."**

25.     The e-mail further indicated that an additional twenty percent (20%) of the estimated project cost of $368,525.00 would be due a few weeks later for the Aquarium fish "life support equipment."

26.     DAWOUD subsequently made the requested $137,410.00 payment.

27.     By means of Frankie's March 11, 2015, e-mails and DAWOUD's second payment, ATM and DAWOUD amended the agreement for the Aquarium Project.

28.     On April 2, 2015, Frankie sent DAWOUD drawings of the rebar layout for the aquarium and, again, acknowledged that ATM had not yet begun construction on the Aquarium Project: "Again, our apologies on the delay of the drawings, but now we can get this moving along and before you know it, the tank will be there." *See* e-mails at **Exhibit "K."**

29.     On May 7, 2015, DAWOUD expressed to Frankie his concern over ATM's lack of response: "I have sent out e-mails, texts and made phone calls and I am not getting any response back. I find this very unprofessional." *See* e-mails at **Exhibit "L."**

5

30.     Frankie responded to DAWOUD's concerns via e-mail, representing to DAWOUD for the first time that ATM had made deposits to multiple other entities and indicated that the continued delays were not of ATM's making: "Unfortunately with this custom project other companies are involved. Once we have gathered all information from the several companies we already gave deposits too, then someone will be in touch with you . . . . This takes time Oliver, and is not something that can happen overnight." *See* e-mails at **Exhibit "L."**

31.     DAWOUD responded to Frankie, assuring Frankie that DAWOUD was not "looking for an immediate resolution," but simply wanted to be kept apprised of whether "processes have started or not." *See* e-mails at **Exhibit "L."**

32.     Rather than providing the requested update, ATM's Vice-President and Chief Operating Officer, Brett Raymer, responded to DAWOUD's concerns by advising that the $147,410.00 deposit DAWOUD had been dispersed amongst various vendors and that ATM actually owed vendors money. *See* e-mails at **Exhibit "M."**

33.     At the time of Raymer's e-mails, ATM had performed *no* construction on the Aquarium and had not delivered any materials to DAWOUD's Residence.

34.     Raymer at no point requested an additional twenty percent (20%) of the estimated Project cost of $368,525.00 for the Aquarium's fish "life support equipment," but as part of a "bait-and-switch" routine, verbally indicated that the Project would actually cost $750,000.00-$900,000.00 and that additional funds would be required to continue.

6

35.     On May 12, 2015, DAWOUD responded, albeit inartfully, in part by stating that "at this point I am at my budget for this project . . . hopefully we can resolve this quickly." *See* e-mails at **Exhibit "M."**

36.     Furthermore, DAWOUD offered to accept the piece of "acrylic and the device that moves the acrylic" for the $147,410.00 he had already paid. *See* e-mails at **Exhibit "M."**

37.     ATM failed to respond.

38.     Subsequently, DAWOUD, through his attorneys, demanded the return of Dawoud's payments, which request was rejected.

39.     ATM has refused to refund the deposit amounts DAWOUD paid or to provide any materials to DAWOUD.

40.     Despite DAWOUD's offers to amiably resolve his dispute with ATM, to date, ATM has not resumed work on the Aquarium Project, refunded DAWOUD's payments, or provided DAWOUD with the acrylic and device that DAWOUD paid for.

41.     Instead, ATM has knowingly and intentionally retained $147,410.00 that DAWOUD paid.

42.     ATM has also knowingly and intentionally retained the acrylic and other materials.

43.     All conditions precedent to the filing of this action have been satisfied, waived, fulfilled, or excused.

44.     DAWOUD has retained the undersigned law firm to represent him in this action and has agreed to pay the firm a reasonable fee for its services.

## COUNT I
## BREACH OF CONTRACT

45.    DAWOUD hereby re-alleges and incorporates by reference paragraphs 1 though 44 as if fully set forth herein.

46.    This is an action for breach of contract, which contract had the hallmarks of offer, acceptance, and consideration.

47.    DAWOUD and ATM entered into an agreement, as described above, whereby ATM agreed to build the Aquarium in exchange for payment.

48.    The agreement is a valid contract.

49.    ATM materially breached the agreement by, amongst other things, significant delays, exponentially increasing the Project cost, prematurely requesting additional payments, failing to construct the Aquarium at DAWOUD's Residence, failing to deliver any of the materials to build the Aquarium, and abandoning the incomplete Aquarium Project while retaining DAWOUD's full payment amounts.

50.    When ATM abandoned the Aquarium Project, DAWOUD was in compliance with and had performed his obligations under the agreement.

51.    Pursuant to the agreement, DAWOUD paid ATM a total of $147,410.00 in advance for labor, design, and materials for the Project.

52.    As a result of ATM's breach of the agreement, DAWOUD suffered damages: DAWOUD paid ATM $147,410.00 under the agreement, but DAWOUD did not receive any substantive benefit in return for the same.

53.    Such damages would not have occurred but for ATM's breach of the agreement.

WHEREFORE, Plaintiff OLIVER DAWOUD demands judgment against Defendant, ACRYLIC TANK MANUFACTURING OF NEVADA, awarding DAWOUD compensatory damages, prejudgment interest, and costs, and for such other and further relief as this Court deems just and proper, and demands trial by jury of all issues triable as a matter of right by jury.

## COUNT II
## UNJUST ENRICHMENT
### (Pled in the Alternative to COUNT I)

54.     DAWOUD hereby re-alleges and incorporates by reference paragraphs 1 though 44 as if fully set forth herein.

55.     This is an action for unjust enrichment, pled in the alternative to Count I stated above.

56.     DAWOUD paid ATM $147,410.00.

57.     ATM acknowledged its receipt of those payments.

58.     Accordingly, DAWOUD has conferred a benefit on ATM, either by the $147,410.00 paid or by the materials ATM claims it purchased and/or fabricated with the $147,410.00 paid.

59.     At all times relevant, ATM had knowledge of the benefit, accepted the benefit as its own, and retained the benefit.

60.     Furthermore, ATM's actions and statements demonstrate that ATM was aware that DAWOUD expected the Aquarium to be constructed in exchange for the budgeted amount.

9

61.     ATM has, furthermore, refused to return the benefit DAWOUD conferred on it—either in the form of money paid or material.

62.     Under the circumstances described herein, ATM's retention of DAWOUD's payments is inequitable.

63.     DAWOUD is entitled to damages as a result of ATM's unjust enrichment, including the disgorgement of the monies ATM has unlawfully retained.

64.     DAWOUD has unsuccessfully demanded return of his payments from ATM, and DAWOUD is without an adequate remedy at law.

WHEREFORE, Plaintiff OLIVER DAWOUD demands judgment against Defendant, ACRYLIC TANK MANUFACTURING OF NEVADA, for the benefit conferred, plus interest, costs, and for such further relief as the Court deems just and equitable, and demands trial by jury of all issues triable as a matter of right by jury.

**COUNT III**
**QUANTUM MERUIT**
**(Pled in the Alternative to COUNT I)**

65.     DAWOUD hereby re-alleges and incorporates by reference paragraphs 1 though 44 as if fully set forth herein.

66.     This is an action for *quantum meruit*, pled in the alternative to Count I stated above.

67.     DAWOUD paid ATM $147,410.00.

68.     ATM acknowledged its receipt of those payments.

69.     ATM's actions and statements imply that ATM acquiesced to an agreement with DAWOUD, namely to build the Aquarium in exchange for the monies

DAWOUD paid and DAWOUD's promises to pay an additional amount upon ATM's completion of the Aquarium Project.

70. Furthermore, ATM's actions and statements demonstrate that ATM was aware that DAWOUD expected the Aquarium to be constructed in exchange for the monies DAWOUD paid and promised.

71. In other words, ATM's actions and statements imply that a contract was entered into between ATM and DAWOUD.

72. Under the circumstances described herein, a reasonable person receiving DAWOUD's payments would expect to provide a good or service in exchange for the amounts paid.

73. ATM failed to construct the Aquarium Project as it agreed to do, and, therefore, by retaining the $147,410.00 paid by DAWOUD, ATM has been unjustly enriched.

74. Accordingly, DAWOUD has conferred a benefit on ATM—either by the $147,410.00 paid or by the materials ATM claims it purchased and/or fabricated with the $147,410.00 paid.

75. At all times relevant, ATM had knowledge of the benefit, accepted the benefit as its own, and retained the benefit, as is evidenced by the copious e-mails communications discussed above and by ATM's continued representations to DAWOUD that it would complete the Aquarium Project.

76. ATM has, furthermore, refused to return the benefit DAWOUD conferred on it, either in the form of money paid or material.

77.    Under the circumstances described herein, ATM's retention of DAWOUD's payments is inequitable.

78.    DAWOUD is entitled to damages as a result of ATM's unjust enrichment, including the disgorgement of the monies ATM has unlawfully retained.

79.    DAWOUD has unsuccessfully demanded return of his payment from ATM and DAWOUD is without an adequate remedy at law.

WHEREFORE, Plaintiff OLIVER DAWOUD demands judgment against Defendant, ACRYLIC TANK MANUFACTURING OF NEVADA, for the benefit conferred, plus interest, costs, and for such further relief as the Court deems just and equitable, and demands trial by jury of all issues triable as a matter of right by jury.

## COUNT IV
## VIOLATIONS OF FLORIDA
## DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

80.    DAWOUD hereby re-alleges and incorporates by reference paragraphs 1 though 44 as if fully set forth herein.

81.    This is an action for violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

82.    ATM represented to DAWOUD that ATM would build the Aquarium in exchange for payment of approximately $368,525.00.

83.    At all relevant times, ATM intended and planned to accept and retain DAWOUD's payments, but also intended and planned *not* to perform the work DAWOUD paid for.

84.    At all relevant times, ATM intended and planned to deceive DAWOUD

by needlessly increasing the price of the Aquarium Project after DAWOUD had already entered into an agreement for the Aquarium.

85. At all relevant times, ATM intended and planned to deceive DAWOUD by accepting and retaining DAWOUD's payments, and then demanding that DAWOUD make additional payments that were not agreed to.

86. In order to carry out the aforementioned plan and deceive DAWOUD, ATM intentionally delayed and exaggerated progress on the Aquarium Project, failed to respond to DAWOUD's inquiries regarding said progress, and falsely represented that it required additional payments although minimal work had taken place.

87. In short, ATM lured DAWOUD with lies about the amount he would be likely to pay, strung him along by delaying work and avoiding questions, and then effectively ransomed the payments DAWOUD had already made by demanding he pay even more if he wanted to see any part of the Aquarium Project completed.

88. ATM's pattern of unnecessarily increasing project costs after an agreement was made, delaying progress on projects, and demanding additional monies for work ATM did not actually perform or intend to perform was a deceptive act and unfair practice.

89. ATM employed all the above deceptive acts and unfair practices against DAWOUD in such a manner which would likely deceive consumers acting reasonably in the same circumstances as DAWOUD.

90. ATM's pattern of deceptive acts and unfair practices against DAWOUD are referred to herein as ATM's "Deceptive Acts."

91.    ATM undertook the Deceptive Acts above, including, without limitation, accepting and retaining DAWOUD's $147,410.00 without having any intention to perform the Project work for approximately $368,525.00.

92.    ATM's acts were part of a "bait-and-switch" routine pursuant to which it informed its customer that the Project price had increased to $750,000.00-$900,000.00 and that additional funds would be required to continue, only after its customer had already paid 147,410.00 and was told that the approximate cost was $368,525.00.

93.    ATM's Deceptive Acts are unconscionable, unfair, and deceptive acts or practices that ATM exercised in the conduct of its trade and/or in commerce.

94.    ATM's Deceptive Acts misled DAWOUD to his detriment, although he acted reasonably in the circumstances.

95.    ATM's Deceptive Acts were likely to deceive consumers acting reasonably in the same circumstances as DAWOUD.

96.    ATM's Deceptive Acts caused actual damage to DAWOUD.

97.    Specifically, and without limitation, because of ATM's Deceptive Acts, DAWOUD paid ATM $147,410.00 to ATM, but received nothing significant in return.

98.    To date, ATM has not resumed work on the Aquarium Project, refunded DAWOUD's payments, or provided DAWOUD with the acrylic and device that DAWOUD paid for.

99.    ATM's Deceptive Acts offend established public policies and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

100.   Although ATM breached an agreement it had with DAWOUD, the

14

Deceptive Acts – including, without limitation, ATM's misrepresentations and intent to deceive DAWOUD – are unfair and deceptive practices that existed before and extend beyond ATM's breach of agreement.

WHEREFORE, Plaintiff OLIVER DAWOUD demands judgment against Defendant, ACRYLIC TANK MANUFACTURING OF NEVADA, for damages, interest, costs, attorneys' fees pursuant to § 501.2105, Fla. Stat., and for such further relief as the Court deems just and equitable, and demands trial by jury of all issues triable as a matter of right by jury.

Dated this 5th day of March, 2018.

LIESER SKAFF ALEXANDER, PLLC
*Attorneys for Plaintiff*
403 N. Howard Avenue
Tampa, Florida 33606
Phone: (813) 280-1256
Facsimile: (813) 251-8715
Secondary (as to all): efile@lieserskaff.com


/s/ Jeffrey P. Lieser
JEFFREY P. LIESER
Fla. Bar. No.: 29164
Primary: jeff@lieserskaff.com
LAURA R. MAULDIN
Primary: laura@lieserskaff.com
Fla. Bar No.: 103091